## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| NICK DIGREGORIO, on behalf of himself and all others similarly situated,<br><br>    Plaintiff,<br><br>v.<br><br>BROWNELLS, INC.,<br><br>    Defendant. | Case No.<br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

## <u>CLASS ACTION COMPLAINT</u>

Plaintiff Nick DiGregorio ("Plaintiff"), on behalf of himself and all other similarly situated (the "Class Members") brings this case against Defendant Brownells, Inc. ("Defendant"), which operates, controls and manages the website brownells.com. Plaintiff brings this action based upon personal knowledge of the facts pertaining to himself, and on information and belief as to all other matters, by and through the investigation of undersigned counsel.

### NATURE OF THE ACTION

1.      This is a class action lawsuit brought on behalf of all Pennsylvania residents who have purchased firearms from brownells.com.

2.      Defendant aids, employs, agrees, and conspires with Meta Platforms, Inc. ("Facebook") to intercept communications sent and received by Plaintiff and Class Members, including communications containing protected information about firearms purchases. Plaintiff brings this action for legal and equitable remedies resulting from these illegal actions.

## JURISDICTION AND VENUE

3.      This Court has subject matter jurisdiction over this action pursuant to the Class Action Fairness Act of 2005, Pub. L. No. 109-2 Stat. 4 ("CAFA"), which, inter alia, amends 28 U.S.C. § 1332, at new subsection (d), conferring federal jurisdiction over class actions where, as here: (a) there are 100 or more members in the proposed class; (b) some members of the proposed Class have a different citizenship from Defendant; and (c) the claims of the proposed class members exceed the sum or value of five million dollars ($5,000,000) in aggregate. See 28 U.S.C. § 1332(d)(2) and (6).

4.      This Court has personal jurisdiction over Defendant because the wrongful conduct giving rise to this case occurred in, was directed to, and/or emanated from this District.

5.      Venue is proper in this District pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to the claim occurred in this District.

## THE PARTIES

6.      Plaintiff Nick DiGregorio is an adult citizen of the Commonwealth and is domiciled in Atglen, Pennsylvania.  On or about March 7, 2023, Plaintiff purchased a Smith & Wesson M&P15 Sport II from brownells.com.  When accessing the website and completing the purchase, Plaintiff was located in Pennsylvania.  Plaintiff also has an active Facebook account which he has maintained since approximately 2013.  Plaintiff accesses his Facebook account from multiple devices, including his computer and smartphone.

7.      Defendant Brownells, Inc. is an Iowa corporation headquartered in Grinnell, Iowa. Defendant owns and operates brownells.com.  Through this website, Defendant sells firearms and firearm accessories.

8.     Pursuant to the systematic process described herein, Defendant, through brownells.com, assisted Facebook with intercepting Plaintiff's communications, including those that contained personally identifiable information and protected information about his firearms purchases.  Defendant assisted these interceptions without Plaintiff's knowledge, consent or express written authorization.  By failing to receive the requisite consent, Defendant breached confidentiality and unlawfully disclosed Plaintiff's personally identifiable information and protected information about his firearms purchases.

## FACTUAL ALLEGATIONS

### 1.     Facebook and the Facebook Tracking Pixel

9.     Facebook is the largest social networking site on the planet, touting 2.9 billion monthly active users.[1]  Facebook describes itself as a "real identity platform,"[2] meaning users are allowed only one account and must share "the name they go by in everyday life."[3]  To that end, when creating an account, users must provide their first and last name, along with their birthday and gender.[4]

10.     Facebook generates revenue by selling advertising space on its website.[5]

---

[1] Sean Burch, *Facebook Climbs to 2.9 Billion Users, Report 29.1 Billion in Q2 Sales*, YAHOO (July 28, 2021), https://www.yahoo.com/now/facebook-climbs-2-9-billion-202044267.html
[2] Sam Schechner and Jeff Horwitz, *How Many Users Does Facebook Have? The Company Struggles to Figure It Out*, WALL. ST. J. (Oct. 21, 2021).
[3] FACEBOOK, COMMUNITY STANDARDS, PART IV INTEGRITY AND AUTHENTICITY, https://www.facebook.com/communitystandards/integrity_authenticity.
[4] FACEBOOK, SIGN UP, https://www.facebook.com/
[5] Mike Isaac, *Facebook's profit surges 101 percent on strong ad sales.*, N.Y. TIMES (July 28, 2021), https://www.nytimes.com/2021/07/28/business/facebook-q2-earnings.html.

11.    Facebook sells advertising space by highlighting its ability to target users.[6] Facebook can target users so effectively because it surveils user activity both on and off its site.[7] This allows Facebook to make inferences about users beyond what they explicitly disclose, like their "interests," "behavior," and "connections."[8]  Facebook compiles this information into a generalized dataset called "Core Audiences," which advertisers use to apply highly specific filters and parameters for their targeted advertisements.[9]

12.    Advertisers can also build "Custom Audiences."[10]  Custom Audiences enable advertisers to reach "people who have already shown interest in [their] business, whether they're loyal customers or people who have used [their] app or visited [their] website."[11] Advertisers can use a Custom Audience to target existing customers directly, or they can use it to build a "Lookalike Audiences," which "leverages information such as demographics, interests, and behavior from your source audience to find new people who share similar qualities."[12]  Unlike Core Audiences, Custom Audiences require an advertiser to supply the underlying data to Facebook.  They can do so through two mechanisms: by manually uploading contact information

---

[6] FACEBOOK, WHY ADVERTISE ON FACEBOOK,
https://www.facebook.com/business/help/205029060038706.
[7] FACEBOOK, ABOUT FACEBOOK PIXEL,
https://www.facebook.com/business/help/742478679120153?id=1205376682832142.
[8] FACEBOOK, AD TARGETING: HELP YOUR ADS FIND THE PEOPLE WHO WILL LOVE YOUR BUSINESS,
https://www.facebook.com/business/ads/ad-targeting.
[9] FACEBOOK, EASIER, MORE EFFECTIVE WAYS TO REACH THE RIGHT PEOPLE ON FACEBOOK,
https://www.facebook.com/business/news/Core-Audiences.
[10] FACEBOOK, ABOUT CUSTOM AUDIENCES,
https://www.facebook.com/business/help/744354708981227?id=2469097953376494.
[11] FACEBOOK, ABOUT EVENTS CUSTOM AUDIENCE,
https://www.facebook.com/business/help/366151833804507?id=300360584271273.
[12] FACEBOOK, ABOUT LOOKALIKE AUDIENCES,
https://www.facebook.com/business/help/164749007013531?id=401668390442328.

for customers, or by utilizing Facebook's "Business Tools," which collect and transmit the data automatically.[13] One such Business Tool is the Facebook Tracking Pixel.

13.    The Facebook Tracking Pixel is a piece of code that advertisers, like Defendant, can integrate into its website.  Once activated, the Facebook Tracking Pixel "tracks the people and type of actions they take."[14]  When the Facebook Tracking Pixel captures an action, it sends a record to Facebook.  Once this record is received, Facebook processes it, analyzes it, and assimilates it into datasets like the Core Audiences and Custom Audiences.

14.    Advertisers control what actions—or, as Facebook calls it, "events"—the Facebook Tracking Pixel will collect, including the website's metadata, along with what pages a visitor views and what buttons a visitor clicks.[15]  Advertisers can also configure the Facebook Tracking Pixel to track other events.  Facebook offers a menu of "standard events" from which advertisers can choose, including what content a visitor views or purchases.[16]  An advertiser can also create their own tracking parameters by building a "custom event."[17]

15.    Advertisers control how the Facebook Tracking Pixel identifies visitors.  The Facebook Tracking Pixel is configured to automatically collect "HTTP Headers" and "Pixel-

---

[13] FACEBOOK, CREATE A CUSTOMER LIST CUSTOM AUDIENCE, https://www.facebook.com/business/help/170456843145568?id=2469097953376494; FACEBOOK, CREATE A WEBSITE CUSTOM AUDIENCE, https://www.facebook.com/business/help/1474662202748341?id=2469097953376494.
[14] FACEBOOK, RETARGETING, https://www.facebook.com/business/goals/retargeting.
[15] *See* FACEBOOK, FACEBOOK PIXEL, ACCURATE EVENT TRACKING, ADVANCED, https://developers.facebook.com/docs/facebook-pixel/advanced/; *see also* FACEBOOK, BEST PRACTICES FOR FACEBOOK PIXEL SETUP, https://www.facebook.com/business/help/218844828315224?id=1205376682832142.
[16] FACEBOOK, SPECIFICATIONS FOR FACEBOOK PIXEL STANDARD EVENTS, https://www.facebook.com/business/help/402791146561655?id=1205376682832142.
[17] FACEBOOK, ABOUT STANDARD AND CUSTOM WEBSITE EVENTS, https://www.facebook.com/business/help/964258670337005?id=1205376682832142.

specific Data."[18]  HTTP Headers collect "IP addresses, information about the web browser, page

location, document, referrer and persons using the website."[19]  Pixel-specific Data includes "the

Pixel ID and cookie."[20]

  **B.**  **Defendant's Website and the Facebook Pixel**

  16.  Defendant's website brownells.com hosts code for the Facebook Tracking Pixel

and is configured to transmit three distinct events to Facebook:[21]

Figure 1



  17.  PageView transmits the Uniform Resource Locator ("URL") accessed.

Figure 2

---

[18] FACEBOOK, FACEBOOK PIXEL, https://developers.facebook.com/docs/facebook-pixel/.
[19] *Id.*
[20] *Id.*
[21] This data derives from a tool created and offered by Facebook.



18.    Defendant's URLs contain detailed information disclosing what products users have browsed.  For example, if a user searches for "Semi Auto Rifles," the URL displayed is "brownells.com%2Fguns%2Frifles%2Fsemi-auto-rifles%2F%3Fsort%3DNumberOfReviews&rl=https%3A%2F%2F" and if that user then clicks on the "Smith & Wesson M&P15 Sport II," the URL changes to "brownells.com%2Fguns%2Frifles%2Fsemi-auto-rifles%2Fmp15-sport-ii-5.56mm-16%2F&rl=https%3A%2F%2F."

19.    Another event titled "AddToCart" registers when users add a product, such as a firearm, to their online shopping cart when they checkout:

Figure 3



20.     The event registers the URL for products added to a customer's online shopping

cart.

21.     Another event titled "Button Click Automatically Detected" registers when users

add a product, such as a firearm, to their online shopping cart and when they checkout:

Figure 4



22.    This event registers, for example, when a purchaser clicks "ADD TO CART," "PROCEED TO CHECKOUT," and "SUBMIT ORDER."

23.    The Button Click event also transmits information entered into form fields:

Figure 5



24.    This includes form fields that must be completed prior to purchase:

Figure 6



25.     This event data, jointly and independently, permit an ordinary person to identify what a consumer has viewed and/or purchased on Defendant's website.

26.     The Facebook Tracking Pixel uses both first- and third-party cookies.  A first-party cookie is "created by the website the user is visiting"—*i.e.*, brownells.com.[22]  A third-party cookie is "created by a website with a domain name other than the one the user is currently visiting"—*i.e.*, Facebook.[23]

27.     When viewing Defendant's website, the Facebook Tracking Pixel compels the user's browser to send seven cookies to Facebook:[24]

---

[22] PC MAG, FIRST-PARTY COOKIES, https://www.pcmag.com/encyclopedia/term/first-party-cookie. This is confirmable by using developer tools to inspect a website's cookies and track network activity.

[23] PC MAG, THIRD-PARTY COOKIES, https://www.pcmag.com/encyclopedia/term/third-party-cookie.  This is also confirmable by tracking network activity.

[24] Not pictured here is the _fbp cookie, which is always transmitted as a first-party cookie.

Figure 7

| fr | 1ce4iBOlvmkADuRai.AW... | .facebook.com |
| c_user | 100035966074568 | .facebook.com |
| sb | qqAzYsNOnTC8nEyb7N... | .facebook.com |
| wd | 1037x937 | .facebook.com |
| datr | MalzYjcua-RaV_XkUENr... | .facebook.com |
| dpr | 1.25 | .facebook.com |
| xs | 43%3AKojw8QeJ5YCarg... | .facebook.com |

28.    The c_user cookie contains that visitor's unencrypted Facebook ID. A Facebook ID is personally identifiable information.  Anyone can identify a Facebook profile—and all personal information publicly listed on that profile—by appending the Facebook ID to the end of Facebook.com.

29.    The fr cookie contains, at least, an encrypted Facebook ID and browser identifier.[25] The datr cookie also identifies a browser.[26]  Facebook, at a minimum, uses the fr and c_user cookies to identify users by their Facebook IDs and corresponding Facebook profiles.[27]

30.    Through the Facebook Tracking Pixel's code, these cookies combine the identifiers with the event data, allowing Facebook to know, among other things, what webpages visitors to Defendant's website are visiting and what products they are purchasing.[28]

31.    Defendant also uses "Advanced Matching."   With Advanced Matching, Defendant's Pixels "look[s] for recognizable form field and other sources on your website that contain information such as first name, last name and email."[29]  That information is recorded,

---

[25] DATA PROTECTION COMMISSIONER, FACEBOOK IRELAND LTD, REPORT OF RE-AUDIT (Sept. 21, 2012),  http://www.europe-v-facebook.org/ODPC_Review.pdf.
[26] FACEBOOK, COOKIES & OTHER STORAGE TECHNOLOGIES, https://www.facebook.com/policy/cookies/.
[27] FACEBOOK, COOKIES & OTHER STORAGE TECHNOLOGIES, https://www.facebook.com/policy/cookies/.
[28] FACEBOOK, GET STARTED, https://developers.facebook.com/docs/meta-pixel/get-started.
[29] https://www.facebook.com/business/help/611774685654668?id=1205376682832142

"along with the event, or action, that took place."[30]  This information is also "hashed,"[31] meaning it is "[a] computed summary of digital data that is a one-way process."  In other words, it "cannot be reversed back into the original data."[32]

Figure 8

> You can use Advanced Matching to help:
>
> - Increase the number of attributed conversions. We can match more of the conversions that happen on your website to people on Meta. This helps you understand the impact of your ads on website conversions.
>
> - Increase your Custom Audience size. We're able to better match your website visitors to people on Meta and increase the size of your Custom Audience.
>
> - Decrease the cost per conversion. Conversion-optimized campaigns become more efficient because we can better identify and deliver ads to the types of people likely to take the actions you care about.

32.     Defendant disclosed this information to Facebook so it can better match visitors to their Facebook profiles.

33.     As part of Advanced Matching, Defendant enabled "Automatic Advanced Matching."  That means Defendant configured the pixel to scan form fields containing a user's email address, first name, last name, phone number, gender, zip code, city and state.[33]  The highlighted line shows that Defendant enabled Automatic Matching.

Figure 9

```
        config.set("1202338107835181", "automaticMatching", {
            "selectedMatchKeys": ["em", "fn", "ln", "ge", "ph", "ct", "st", "zp", "db", "country", "external_id"]
        });
        fbq.loadPlugin("inferredevents");
        fbq.loadPlugin("identity");
        instance.optIn("1202338107835181", "AutomaticMatching", true);
```

---

[30] FACEBOOK, ABOUT ADVANCED MATCHING FOR WEB,
https://www.facebook.com/business/help/611774685654668?id=1205376682832142.
[31] DEFINITION OF HASH, https://www.pcmag.com/encyclopedia/term/hash
[32] *Id.*
[33]  Facebook provides a corresponding look-up table: FACEBOOK, ADVANCED MATCHING,
https://developers.facebook.com/docs/meta-pixel/advanced/advanced-matching.

34.     Defendant knows that Facebook will match the Advanced Matching parameters with a customer's subsequent activity, thereby helping them "[i]ncrease the number of attributed conversions," "[i]ncrease [their] Custom Audience size," and "[d]ecrease the cost per conversion."[34]

35.     By compelling a visitor's browser to disclose the Advanced Matching parameters and event data Defendant knowingly discloses information sufficiently permitting an ordinary person to identify a specific individual's website activity, including what webpages they visit and what products they purchase.

**C.     Defendant Never Received Consent from Plaintiff and Class Members to Assist Facebook with Intercepting Their Communications**

36.     Defendant never received consent from users to intercept their electronic communications.

37.     Plaintiff and Class Members did not consent to Defendant's privacy policies prior to Facebook intercepting their electronic communications.  Even if applicable, that privacy policy fails to disclose that Defendant assists Facebook with intercepting communications that contain sensitive information.

38.     Likewise, Facebook never receives consent from users to intercept and collect electronic communications containing their sensitive and unlawfully disclosed information.  In fact, Facebook expressly warrants the opposite.

---

[34] FACEBOOK, ABOUT ADVANCED MATCHING FOR WEB, https://www.facebook.com/business/help/611774685654668?id=1205376682832142.

39.     When first signing up, a user assents to three agreements: the Terms of Service,[35] the Cookies Policy,[36] and the Data Policy.[37]

40.     Facebook's Terms of Service begins by stating that "[p]rotecting people's privacy is central to how we've designed our ad system."[38]  The Terms of Service then prohibits anyone from using Facebook's Products in a manner that is "unlawful, misleading, discriminatory or fraudulent."[39]

41.     Facebook's Data Policy recognizes that there may be "[d]ata with special protections,"  meaning information that "could be subject to special protections under the laws of your country."[40]  The Data Policy goes on to describe how Facebook collects information from its "Meta Business Tools," including "our social plug-ins (such as the Like button), Facebook Login, our APIs and SDKs, or the Meta pixel."[41]  Specifically, Facebook acknowledges that "[p]artners receive your data when you visit or use their services or through third parties they work with."[42]

42.     Facebook then offers an express representation: "**We require each of these partners to have lawful rights to collect, use and share your data before providing any data to us**."[43]  Facebook does acknowledge collecting "data with special protections" to personalize ads, but critically, only sensitive information that users "choose to provide."[44]

---

[35] FACEBOOK, TERMS OF SERVICE, https://www.facebook.com/legal/terms/update.
[36] FACEBOOK, COOKIES & OTHER STORAGE TECHNOLOGIES, https://www.facebook.com/policies/cookies/.
[37] FACEBOOK, DATA POLICY, https://www.facebook.com/about/privacy/update.
[38] FACEBOOK, TERMS OF SERVICE, https://www.facebook.com/legal/terms/update..
[39] *Id.*
[40] FACEBOOK, DATA POLICY, https://www.facebook.com/about/privacy/update.
[41] FACEBOOK, DATA POLICY, https://www.facebook.com/about/privacy/update.
[42] *Id.*
[43] *Id.*
[44] *Id.*

43.     Facebook's Cookies Policy ratifies those representations, stating "the Data Policy will apply to our processing of the data that we collect via cookies."[45]

44.     Facebook's other representations reinforce these warranties.  In its Advertising Policy, Facebook states "[w]e do not use sensitive personal data for ad targeting."[46]  And in a blog post titled "About Restricted Meta Business Tools Data," Facebook asserts it has "policies around the kinds of information businesses can share with us."[47]  Facebook does not "want websites or apps sending us sensitive information about people."[48]  Sensitive information includes, among other things, "any information defined as sensitive under applicable laws, regulations and applicable industry guidelines."[49]

45.     These representations are repeated frequently.  Facebook created a "Help Center" to better explain its practices to users.  In an article titled, "How does Facebook receive information from other businesses and organizations?," Facebook reiterates its promise to "prohibit businesses or organizations from sharing sensitive information with us," and if Facebook "determine[s] that a business or an organization is violating our terms, we'll take action against that business or organization."[50]  In another article, titled, "How does Meta work with data providers?," Facebook repeats this promise, stating "[b]usinesses that advertise on Facebook are required to have any

---

[45] FACEBOOK, COOKIES & OTHER STORAGE TECHNOLOGIES,
https://www.facebook.com/policies/cookies/.
[46] FACEBOOK, ADVERTISING POLICY, https://www.facebook.com/policies/ads/.
[47] FACEBOOK, ABOUT RESTRICTED META BUSINESS TOOLS DATA,
https://www.facebook.com/business/help/1057016521436966?id=188852726110565
[48] Id.
[49] Id.
[50] FACEBOOK, HOW DOES FACEBOOK RECEIVE INFORMATION FROM OTHER BUSINESSES AND
ORGANIZATIONS, https://www.facebook.com/help/2230503797265156.

necessary rights and permissions to use this information, as outlined in our Custom Audience Terms that businesses must agree to."[51]

46.    Based on these representations, Facebook never receives consent from users to intentionally intercept and monetize electronic communications disclosing sensitive information that the law protects.

47.    Moreover, upon information and belief, Defendant has never entered into an agreement with Facebook that would obligate Facebook to keep disclosed information confidential.

## CLASS ALLEGATIONS

48.    **Class Definition:**  Plaintiff seeks to represent a class of similarly situated individuals defined as all persons in Pennsylvania who have a Facebook account and who purchased a firearm from brownells.com (the "Class").

49.    Subject to additional information obtained through further investigation and discovery, the above-described Class may be modified or narrowed as appropriate, including through the use of multi-state subclasses.

50.    **Numerosity (Fed. R. Civ. P. 23(a)(1)):**  At this time, Plaintiff does not know the exact number of members of the aforementioned Class.  However, given the popularity of Defendant's website, the number of persons within the Class are believed to be so numerous that joinder of all members is impractical.

51.    **Commonality and Predominance (Fed. R. Civ. P. 23(a)(2), 23(b)(3)):**  There is a well-defined community of interest in the questions of law and fact involved in this case.

---

[51] How does Meta work with data providers?, https://www.facebook.com/help/494750870625830?ref=dp.

Questions of law and fact common to the members of the Class that predominate over questions that may affect individual members of the Class include:

    (a) whether Defendant collected users' PII, website activities and firearms purchases;

    (b) whether Defendant unlawfully disclosed and continue to disclose its users' PII, website activities and firearms purchases in violation of Pennsylvania Wiretapping Act, 8 Pa. Cons. Stat. § 5701, *et seq.*;

    (c) whether Defendant unlawfully disclosed and continue to disclose its users' PII, website activities and firearms purchases in violation of Uniform Firearms Act, 18 Pa.C.S. § 6111(i); and

    (d) whether Defendant disclosed its users PII, website activities and firearms purchases without consent.

52.    **Typicality (Fed. R. Civ. P. 23(a)(3)):**  Plaintiff's claims are typical of those of the Class because Plaintiff, like all members of the Class, used Defendant's website, and had his PII, website activities and firearms purchases disclosed by Defendant.

53.    **Adequacy (Fed. R. Civ. P. 23(a)(4)):** Plaintiff has retained and is represented by qualified and competent counsel who are highly experienced in complex consumer class action litigation, including litigation concerning the data privacy and the Facebook Tracking Pixel in particular.  Plaintiff and his counsel are committed to vigorously prosecuting this class action. Moreover, Plaintiff is able to fairly and adequately represent and protect the interests of the Class. Neither Plaintiff nor his counsel has any interest adverse to, or in conflict with, the interests of the absent members of the Class.  Plaintiff has raised viable statutory claims or the type reasonably expected to be raised by members of the Class, and will vigorously pursue those claims.  If necessary, Plaintiff may seek leave of this Court to amend this Class Action Complaint to include additional representatives to represent the Class, additional claims as may be appropriate, or to amend the definition of the Class to address any steps that Defendant took.

54.    **Superiority (Fed. R. Civ. P. 23(b)(3)):**  A class action is superior to other available methods for the fair and efficient adjudication of this controversy because individual litigation of the claims of all members of the Class is impracticable.  Even if every member of the Class could afford to pursue individual litigation, the court system could not.  It would be unduly burdensome to the courts in which individual litigation of numerous cases would proceed.  Individualized litigation would also present the potential for varying, inconsistent or contradictory judgments, and would magnify the delay and expense to all parties and to the court system resulting from multiple trials of the same factual issues.  By contrast, the maintenance of this action as a class action, with respect to some or all of the issues presented herein, presents few management difficulties, conserves the resources of the parties and of the court system and protects the rights of each member of the Class.  Plaintiff anticipates no difficulty in the management of this action as a class action.

## CLAIMS FOR RELIEF

### COUNT I
### Violation of the Pennsylvania Wiretapping Act
### 18 Pa. Cons. Stat. § 5701, *et seq.*

55.    Plaintiff repeats the allegations contained in the paragraphs above as if fully set forth herein.

56.    Plaintiff brings this Count individually and on behalf of the members of the Class.

57.    The Pennsylvania Wiretapping Act prohibits (1) the interception or procurement of another to intercept any wire, electronic, or oral communication; (2) the intentional disclosure of the contents of any wire, electronic, or oral communication that the discloser knew or should have known was obtained through the interception of a wire, electronic, or oral communication; and (3) the intentional use of the contents of any wire, electronic, or oral communication that the discloser

knew or should have known was obtained through the interception of a wire, electronic, or oral communication. 18 Pa. Cons. Stat. § 5703.

58.     Any person who intercepts, discloses, or uses or procures any other person to intercept, disclose, or use, a wire, electronic, or oral communication in violation of the Act is subject to a civil action for (1) actual damages, not less than liquidated damages computed at a rate of $100 per day for each violation or $1,000, whichever is higher; (2) punitive damages; and (3) reasonable attorneys' fees and other litigation costs incurred. 18 Pa. Cons. Stat. § 5725(a).

59.     "Intercept" is defined as the "[a]ural or other acquisition of the contents of any wire, electronic or oral communication through the use of any electronic, mechanical or other device." 18 Pa. Cons. Stat. § 5702. "Electronic, mechanical or other device," in turn, means "[a]ny device or apparatus … that can be used to intercept a wire, electronic or oral communication[.]" *Id.*

60.     The following constitutes a device within the meaning of 18 Pa. Cons. Stat. § 5702:

   a.  The computer codes and programs that Defendant used to track Plaintiff and Class Members' communications while navigating the website;

   b.  Plaintiff's and Class Members' web browsers;

   c.  Plaintiff's and Class Members' computing devices;

   d.  Defendant's web servers;

   e.  The web servers from which Facebook received the Plaintiff's and Class Members' communications while they were using a web browser to access Defendant's website;

   f.  The plan Defendant carried out to effectuate their tracking of Plaintiff's and Class Members' communications while using a web browser to access the website.

61.     At all relevant times, Defendant procured Facebook to track and intercept Plaintiff's and other Class Members' internet communications while navigating its website. Defendant sent these communications to Facebook without authorization or consent from Plaintiff or Class Members.

62.     Defendant, when procuring Facebook to intercept Plaintiff' communications, intended Facebook to learn the meaning of the content the visitor requested.

63.     Plaintiff and Class Members had a justified expectation under the circumstances that their electronic communications would not be intercepted.

64.     Plaintiff and Class Members were not aware that their electronic communications were being intercepted by Facebook.

**COUNT II**
**Violation of the Uniform Firearms Act**
**18 Pa.C.S. § 6111(i)**

65.     Plaintiff repeats the allegations contained in the paragraphs above as if fully set forth herein.

66.     Plaintiff brings this Count individually and on behalf of the members of the Class.

67.     Section 6111(i) of the Uniform Firearms Act ("UFA") provides the following:

> **(i) Confidentiality.**--All information provided by the potential purchaser, transferee or applicant, including, but not limited to, the potential purchaser, transferee or applicant's name or identity, furnished by a potential purchaser or transferee under this section or any applicant for a license to carry a firearm as provided by section 6109 shall be confidential and not subject to public disclosure. In addition to any other sanction or penalty imposed by this chapter, any person, licensed dealer, State or local governmental agency or department that violates this subsection shall be liable in civil damages in the amount of $1,000 per occurrence or three times the actual damages incurred as a result of the violation, whichever is greater, as well as reasonable attorney fees.

20

68.     Plaintiff is a "purchaser" under the UFA because he purchased a firearm from Defendant.  On or about March 7, 2023, Plaintiff purchased a Smith & Wesson M&P15 Sport II from brownells.com.

69.     Defendant disclosed to Facebook information that Plaintiff provided to it in connection with his purchase of this firearm.  Specifically, Defendant disclosed Plaintiff's name, address, his Facebook ID, the type of gun that he purchased, among other items.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, individually and on behalf of all others similarly situated, seeks judgment against Defendant, as follows:

a.     Determining that this action is a proper class action;

b.     For an order certifying the Class, naming Plaintiff as representative of the Class, and naming Plaintiff's attorneys as Class Counsel to represent the Class;

c.     For an order declaring that Defendant's conduct violates the statute referenced herein;

d.     For an order finding in favor of Plaintiff and the Class on the counts asserted herein;

e.     Awarding compensatory damages, including statutory damages where available, to Plaintiff and the Class Members against Defendant for all damages sustained as a result of Defendant's wrongdoing, in an amount to be proven at trial;

f.     For punitive damages, as warranted, in an amount to be determined at trial;

g.     Ordering Defendant to disgorge revenues and profits wrongfully obtained;

h.     For prejudgment interest on all amounts awarded;

i.     For injunctive relief as pleaded or as the Court may deem proper;

j.    For an order awarding Plaintiff and the Class their reasonable attorneys' fees and

expenses and costs of suit; and

k.    Granting Plaintiff and the Class Members such further relief as the Court deems

appropriate.

## JURY DEMAND

Plaintiff hereby demands a trial by jury on all claims so triable in this action.

Dated:  November 17, 2023                    Respectfully submitted,

By:    _Steven A. Schwartz_
**CHIMICLES SCHWARTZ KRINER
& DONALDSON-SMITH LLP**
Steven A. Schwartz (PA I.D. No. 50579)
Alex M. Kashurba (PA I.D. No. 319003)
361 W. Lancaster Avenue
Haverford, PA 19041
Tel: (610) 642-8500
Fax: (610) 649-3633
E-Mail: sas@chimicles.com
        amk@chimicles.com

**BURSOR & FISHER, P.A.**
Joshua D. Arisohn*
Philip L. Fraietta*
1330 Avenue of the Americas, 32nd Floor
New York, NY 10019
Tel: (646) 837-7150
Fax: (212) 989-9163
E-Mail: jarisohn@bursor.com
        pfraietta@bursor.com

**BURSOR & FISHER, P.A.**
Stephen A. Beck*
Christopher R. Reilly*
701 Brickell Ave., Suite 1420
Miami, FL 33131-2800
Telephone: (305) 330-5512
Facsimile: (305) 676-9006
E-Mail: sbeck@bursor.com
        creilly@bursor.com

*Pro Hac Vice Application Forthcoming
Attorneys for Plaintiff and the Putative Class*

22